AO 106 (Rev. 04/10) Application for a Search Warrant

# United States District Court
## for the
### Western District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

1. one white Samsung cellular phone, S/N G360T1UVU1AOFA ("Subject Device 1");
2. one black LG cellular phone, S/N 701CQSF0563174 ("Subject Device 2");
3. one black Samsung cellular phone, SKU SMB311VZPP, MEID A000004767B316 ("Subject Device 3");
4. one black LG cellular phone, S/N 611CQCV0294275 ("Subject Device 4"); and
5. one black iPhone 6 cellular phone ("Subject Device 5"), together with all electronic devices, including Subscriber Identity Modules, or SIM cards, contained therein (collectively, the "Subject Devices").

**Case No. 17-mj-1123**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, which is attached and incorporated herein by reference.

located in the Western District of New York, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, which is attached and incorporated herein by reference.

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 1952(a) *[statutory violation(s)]*.

The application is based on these facts:

- ☒ continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

CHARLES S. TOLIAS
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 3_, 2017

_____
*Judge's signature*

HONORABLE JEREMIAH J. McCARTHY
UNITED STATES MAGISTRATE JUDGE
*Printed name and Title*

City and state: Buffalo, New York

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the following devices:

(1) One white Samsung cellular phone, S/N G360T1UVU1AOFA, together with all electronic devices, including Subscriber Identity Modules, or SIM cards, contained therein ("Subject Device 1"). Subject Device 1 is currently located in the custody of Homeland Security Investigations (HSI), at 250 Delaware Avenue, Buffalo, New York, 14202. Subject Device 1 is pictured below:



1

(2) one black LG cellular phone, S/N 701CQSF0563174, together with all electronic devices, including Subscriber Identity Modules, or SIM cards, contained therein ("Subject Device 2"). Subject Device 2 is currently located in the custody of HSI at 250 Delaware Avenue, Buffalo, New York, 14202. Subject Device 2 is pictured below:

 

(3) one black Samsung cellular phone, SKU SMB311VZPP, MEID
A000004767B316, together with all electronic devices, including Subscriber
Identity Modules, or SIM cards, contained therein ("Subject Device 3").
Subject Device 3 is currently located in the custody of HSI at 250 Delaware
Avenue, Buffalo, New York, 14202. Subject Device 3 is pictured below:

 

3

(4) one black LG cellular phone, S/N 611CQCV0294275, together with all
electronic devices, including Subscriber Identity Modules, or SIM cards,
contained therein ("Subject Device 4"). Subject Device 4 is currently located in
the custody of HSI at 250 Delaware Avenue, Buffalo, New York, 14202.
Subject Device 4 is pictured below:



(5) one black iPhone 6 cellular phone, together with all electronic devices, including Subscriber Identity Modules, or SIM cards, contained therein ("Subject Device 5"). Subject Device 5 is currently located in the custody of HSI at 250 Delaware Avenue, Buffalo, New York, 14202. Subject Device 5 is pictured below:

 

## ATTACHMENT B

ITEMS TO BE SEARCHED FOR AND SEIZED

The following items are to be searched for and seized from the Subject Devices described in Attachment A, including items, records, documents, materials and files, whether in physical/documentary or electronic form, to include:

1.    All records on the Subject Devices that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Possession with the Intent to Distribute a Controlled Substance, and conspiracy to do so), and Title 18, United States Code, Section 1952(a)(1) (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises) involving Yohan FORTIS REYES ("FORTIS") and Moises Nicklas TORRES ("TORRES"), including:

        a.    lists of customers and related identifying information;

        b.    types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

        c.    any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

        d.    any information recording FORTIS's or TORRES's schedule or travel, including but not limited to GPS information;

        e.    all bank records, checks, credit card bills, account information, and other financial records;

        f.    any and all call logs and lists of incoming and outgoing phone calls;

        g.    any and all names, phone numbers, addresses, and e-mail addresses stored within the subject devices;

        h.    any and all notes, documents, records, or correspondence, in any format or medium, relating to drug trafficking or any associated illegal activities;

i.     any and all opened and/or unopened electronic communications, to include voicemail recordings; text, SMS, and MMS messages; e-mails; pictures and/or videos; instant messages; chat logs; audio files; and internet browsing history;

j.     any and all IP source & destination information;

k.     any and all information related to possible co-conspirators;

2.     Evidence of user attribution showing who used or owned the Subject Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

STATE OF NEW YORK   )
COUNTY OF ERIE        )      SS:
CITY OF BUFFALO      )

I, **CHARLES S. TOLIAS**, having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent for Homeland Security Investigations (HSI) and have held such position since December 2008.  I am currently assigned to the Special Agent in Charge (SAC) Buffalo Office and to the Financial Investigations Group within that office. Previously, I was employed with United States Customs and Border Protection (CBP) for approximately six years.  My duties include the investigation of such offenses as bulk cash smuggling, money laundering, bank fraud, mail fraud, wire fraud, and other financial crimes.

2.      As a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.      I make this affidavit in support of an application for a warrant to search:

a.      one white Samsung cellular phone, S/N G360T1UVU1AOFA ("Subject Device 1");

b.      one black LG cellular phone, S/N 701CQSF0563174 ("Subject Device 2");

c.      one   black   Samsung   cellular   phone,   SKU   SMB311VZPP,   MEID

A000004767B316 ("Subject Device 3");

d.    one black LG cellular phone, S/N 611CQCV0294275 ("Subject Device 4"); and

e.    one black iPhone 6 cellular phone ("Subject Device 5"), together with all electronic devices, including Subscriber Identity Modules, or SIM cards, contained therein (collectively, the "Subject Devices"). The Subject Devices are in the custody of HSI, at 250 Delaware Avenue, Buffalo, New York, and depicted in **Attachment A**.

4.    I have received specialized training in numerous aspects of criminal investigation, in particular, investigation into the possession, manufacture, distribution, and importation of illegal drugs, as well as methods used to conceal and finance illegal drug transactions. I have received training in these areas and have participated in interviews of witnesses, arrested subjects, sources of information and confidential informants regarding illegal drug trafficking.

5.    Through my training, education and experience, and that of others, I know that drug traffickers often communicate with their drug trafficking associates through the use of cellular telephones and that drug traffickers often change cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I also know that drug traffickers commonly maintain addresses or telephone numbers in cellular telephones, which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization.

6.    Because this affidavit is being submitted for the limited purpose of establishing probable cause for a search warrant authorizing the search of the

aforementioned Subject Devices for the items specified in **Attachment B** hereto, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the Subject Devices contain evidence relating to the commission of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (possession with the intent to distribute and distribution of a controlled substance, and conspiracy to do so) and Title 18, United States Code, Section 1952(a) (interstate and foreign travel or transportation in aid of racketeering enterprises).

## SUMMARY OF RELEVANT TECHNOLOGY

7.     A cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "land line" telephones. A cellular telephone usually includes a "call log," which records the telephone number, date, and time of calls made to and from the phone.

8.     In addition to enabling voice communications, cellular telephones offer a broad range of other capabilities. These capabilities include, but are not limited to: (a) storing names and phone numbers in electronic "address books"; (b) sending, receiving, and storing text messages and emails; (c) taking, sending, receiving, and storing still photographs and videos; (d) storing and playing back audio files; (e) storing dates, appointments, and other information on personal calendars; and (f) accessing and downloading information

from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

9.     A Subscriber Identity Module, more commonly referred to as a SIM card, is a removable memory chip that is used in some models of cellular telephones. The SIM card is capable of holding a variety of personal data including telephone numbers, text messages, images, and billing information. The SIM card can be moved from one cellular phone to another and will display the saved data on each compatible phone into which it is inserted.

## DETAILS OF INVESTIGATION

10.     Based on my interviews of Tennessee 21st Judicial Drug Task Force and CBP Personnel, review of information provided by other law enforcement agencies, and my personal participation in the investigation, I have learned the following information:

### Tennessee

11.     On April 3, 2017, an agent with the 21st Judicial District Drug Task Force was sitting stationary in a marked police vehicle in the median near the 155 mile marker of Interstate 40 in Hickman County, Tennessee, monitoring westbound traffic, when he observed a silver Nissan Xterra bearing Texas tag 1BD1820 affixed to the rear of the vehicle. The agent conducted a traffic stop of the vehicle for the violation of traveling over lane lines marked for traffic and following too closely.

12.     Pursuant to the traffic stop, the agent determined the vehicle to be occupied

by Yohan FORTIS REYES ("FORTIS"), the driver of the vehicle, and Moises Nicklas TORRES ("TORRES"), a passenger in the vehicle. Both FORTIS and TORRES presented Texas driver's licenses containing addresses in Houston, Texas.

13.     FORTIS told the agent they were traveling to Houston, Texas, returning from Nashville, Tennessee, where they visited family for two to three days. Both FORTIS and TORRES stated the vehicle belonged to TORRES, and when the agent asked TORRES if he was responsible for everything in the vehicle, he responded, "Yes."

14.     FORTIS told the agent he left Houston, Texas, on Friday, March 31, 2017, at approximately midnight, with TORRES, arriving in Nashville, Tennessee, on Saturday, April 1, 2017. FORTIS then changed his story, stating he took a bus from Houston, to Nashville, because TORRES was already in Nashville. The agent asked FORTIS where his family resided in Nashville, to which FORTIS could not provide an answer.

15.     TORRES told the agent he left Houston, Texas, with FORTIS on Friday, March 31, 2017, and remained together the whole time.

16.     The agent asked FORTIS and TORRES separately if they were traveling with anything illegal in the vehicle, to include narcotics, to which both FORTIS and TORRES responded they were not. The agent then asked FORTIS and TORRES, separately, if they were traveling with any large amounts of U.S. currency in the vehicle over $2,000, to which both replied they were not.

17.    The agent asked FORTIS if the agent could search the vehicle for any of the items mentioned, to which FORTIS granted consent, both verbally and in writing.

18.    The agent asked TORRES separately if the agent could search the vehicle for any of the items mentioned, to which TORRES granted consent, both verbally and in writing.

19.    Pursuant to the search of the vehicle, agents located Subject Device 1 and Subject Device 2 on the center console of the vehicle.  They also located Subject Device 3 inside a pair of jeans placed in a duffle bag lying on the back seat of the vehicle.  The jeans were the same size as the jeans FORTIS was wearing at the time of his encounter.

20.    Agents also located a greyhound bus ticket bearing FORTIS' name inside the vehicle, indicating on April 2, 2017, he was scheduled to be on a bus from Houston, Texas, to Cleveland, Ohio.  The agent knew this to be inconsistent with FORTIS' statement that he had traveled from Houston, Texas, to Nashville, Tennessee.

21.    Agents also located an empty plastic oven bag with the corner missing and an open box of oven bags in the center console storage compartment of the vehicle.

22.    Pursuant to the search of the vehicle, the agent removed the inside plastic panel located on the passenger side of the rear cargo area to inspect the natural voids of the vehicle and observed Subject Device 4 attached to a charger hidden in the natural void

behind the taillight.

23.     The agent then removed the inside plastic panel located on the driver's side of the rear cargo area, and observed one red-colored shrink-wrapped bundle concealed in a natural void of the vehicle. The agent removed the bundle, which was contained within a plastic oven bag appearing to be an exact match to the oven bags located in the center console storage compartment.

24.     The agent cut into the bag and shrink wrap and observed U.S. currency. The agent removed a total of three bundles of U.S. currency from the driver's side natural void. Each of the three bundles was shrink-wrapped and placed into oven bags and tied in a knot from the corner of the bag.

25.     During the course of the traffic stop, the agent determined through license plate reader (LPR) data that the silver Nissan Xterra bearing Texas tag 1BD1820 was scanned by a Buffalo Police Department camera, located in Buffalo, New York, on April 2, 2017, at approximately 6:54 p.m. EST.

26.     The agent read FORTIS his Miranda Rights which FORTIS subsequently waived. FORTIS again confirmed he took a bus from Houston, Texas, to Nashville, Tennessee. The agent then confronted FORTIS with the bus ticket located pursuant to the consent search of the vehicle, after which FORTIS admitted to taking a bus to Cleveland, Ohio, by mistake. FORTIS then stated TORRES was in Nashville, Tennessee, so TORRES

traveled to Cleveland to pick up FORTIS.

27.     FORTIS stated the money did not belong to him and he did not know it was inside the vehicle or anything further about the money.  He also stated he did not believe TORRES knew anything about the money located in the vehicle.  FORTIS indicated he was willing to sign a disclaimer of ownership in regard to the money located inside the vehicle.

28.     The agent read TORRES his Miranda Rights which TORRES subsequently waived.  The agent informed TORRES of the currency located inside the vehicle.  TORRES stated he did not know the money was inside the vehicle, but stated FORTIS had told TORRES he would take responsibility for whatever was found inside the vehicle.

29.     TORRES again claimed FORTIS was in the vehicle with him when he left Houston, Texas.  The agent then confronted TORRES with the bus ticket located pursuant to the consent search of the vehicle, after which TORRES stated he did not know whether FORTIS was with him or not.  TORRES then stated again that FORTIS was with him in the vehicle during the trip from Houston, Texas, to Nashville, Tennessee.  The agent asked if he traveled anywhere other than Nashville, Tennessee, to which TORRES stated he traveled to Nashville where he stayed for three days.  The agent asked when he was last in Cleveland, Ohio, to which TORRES stated he had never been to Cleveland.

30.     TORRES advised he was the owner of the vehicle but could not recall for how long.  A bill of sale located inside the vehicle pursuant to the consent search of the

vehicle showed the vehicle was purchased on February 2, 2017.

31.     The agent asked TORRES if he had ever been to Buffalo, New York, to which TORRES replied he had not.  The agent asked TORRES if FORTIS had taken the vehicle by himself at any time while in Nashville, to which TORRES stated FORTIS left for a period of time in the vehicle, but he did not know how long FORTIS was gone or where he traveled.  The agent asked TORRES if FORTIS was gone minutes, hours, or days, to which TORRES stated he did not know.

32.     TORRES stated the money did not belong to him and he was willing to sign a disclaimer of ownership in regard to the money located inside the vehicle.

33.     The 21st Judicial District Drug Task Force subsequently seized the U.S. currency, totaling USD $84,980, as well as Subject Devices 1-4 located inside the vehicle, Subject Device 5 located on TORRES' person, and the silver Nissan Xterra bearing Texas tag 1BD1820.

34.     The currency was transported to the 21st Judicial District Drug Task Force safe where U.S. currency is stored per policy.  Additionally, per 21st Judicial District Drug Task Force policy, narcotics are never stored in that same safe.

35.     On April 4, 2017, agents removed the U.S. currency from the safe, and obtained ION swabs of the currency.  On April 10, 2017, agents retrieved the ION swabs

from the safe and transported them to the Counter Drug Unit at the Tennessee National Guard in Smyrna, Tennessee, for testing.  The testing of the ION swabs revealed the swabs alerted for the presence of cocaine.

## Buffalo

36.      On April 13, 2017, HSI Buffalo received Subject Devices 1-5 from the 21st Judicial District Drug Task Force via mail.  The Subject Devices were processed and seized by HSI, and have since remained in the custody of HSI pending issuance of this search warrant.

37.      Since April 13, 2017, the cellular phones and associated SIM cards, which are the subject of this affidavit, have been maintained in the custody of HSI.

38.      On May 7, 2017, a rental vehicle bearing Kentucky license plate #510WHP was encountered at the Peace Bridge Port of Entry (POE) located in Buffalo, New York. FORTIS was the driver and sole occupant of the vehicle.  FORTIS stated to CBP Officers that he currently resides in Houston, Texas, and that he flew from Houston to Charlotte, North Carolina, and on to Cleveland, Ohio, where he and his stepbrother (TORRES) rented two vehicles.  FORTIS said that both vehicles were rented by TORRES.

39.      FORTIS stated that he and TORRES drove the rental vehicles to Buffalo, New York, to visit family, yet FORTIS was unable to provide a location on where TORRES was and could also not recall TORRES' birthdate.  Additionally, FORTIS was

unable to provide the names or locations of family members he was going to visit. A search of FORTIS' cellular phone revealed text messages from "DEMELO" listing an address in Hamburg, New York, (5442 Camp Road, Hamburg, New York) where FORTIS was to meet "DEMELO". A Super 8 Motel is located at the address.

40.     On May 8, 2017, the above rental vehicle (Kentucky license plate #510WHP) was observed parked at the Super 8 Motel located at 5442 Camp Road, Hamburg, New York. Parked next to the vehicle was a grey Nissan Xterra bearing Texas license plate #HSJ9627. HSI agents observed two males exit the hotel and load each vehicle (separately) with luggage. Both vehicles departed the motel in tandem shortly thereafter.

41.     Both vehicles traveled to Interstate 90 and continued driving westbound toward Pennsylvania. The rental vehicle (Kentucky license plate #510WHP) was observed exiting Interstate 90 by the Eden/Angola exit. After getting gas, the rental vehicle traveled westbound on Interstate 90 before exiting and driving to a Walmart parking lot located in Erie, Pennsylvania where it remained for a couple of hours.

42.     HSI agents observed the Nissan Xterra continue on Interstate 90 until exiting at the Dunkirk exit where it drove to a Tops supermarket located at 3955 Vineyard Drive, Dunkirk, New York. HSI agents maintained surveillance of the subject (later determined to be FORTIS) while he remained in the parking lot for approximately three hours. While at the plaza, FORTIS was observed parking his vehicle in different spots, exiting his vehicle to talk to an unknown white male (appearing to obtain directions from the subject), and exit

11

his vehicle to enter an AT&T store located at the plaza.

43.     FORTIS ultimately drove away from the plaza and was observed merging back onto Interstate 90 Westbound where he traveled until being pulled over by New York State Police (NYSP) for a traffic infraction (driving too fast through a construction zone). FORTIS presented NYSP with a Texas identification card showing him to be FORTIS.  A search of the vehicle by HSI and NYSP revealed natural void areas located in the rear passenger taillight areas of the vehicle.  Dryer sheets were also observed attached (with scotch tape) to the inside of the vents located in the interior area of the rear quarter panels of the vehicle.  After an inspection of the vehicle was complete, FORTIS was released.

## Probable Cause of Drug Trafficking

44.     Based on my knowledge, training, and experience, your affiant knows that cellular telephones are common communication devices used by individuals engaged in narcotics distribution and in conspiracies to distribute narcotics.  Such individuals typically store in their cellular telephones the telephone numbers of co-conspirators, as well as text and data messages with their co-conspirators.  Your affiant also knows that digital cameras are used by those engaged in narcotics distribution to photograph and videotape narcotics and narcotics-related items.

45.     Based on my training and experience investigating cases involving drug trafficking, your affiant also knows drug trafficking organizations (DTOs) often place trackers in vehicles so they can track the whereabouts of their contraband.

46.     Based upon my training and experience, your affiant knows that there are common drug trafficking routes that DTO's utilize when conducting illicit activity.  The routes often originate from areas located along the United States border with Mexico (California, Arizona, and Texas).  Narcotics are transported to locations throughout the United States where they are in turn distributed.  Once proceeds are received from the sale and distribution of the narcotics, the money is then transported back to the DTO, and the process starts over again.

47.     FORTIS and TORRES presented inconsistent stories to the 21st Judicial Drug Task Force and CBP and were unable to remember specifics on how they traveled from one location to another and who they were with just a day or two prior to their encounters. FORTIS and TORRES were also unable to recall simple information such as where family members resided who they had allegedly visited a few days before.

48.     A greyhound bus ticket was found in the vehicle during the Tennessee traffic stop bearing FORTIS's name that indicated FORTIS was scheduled to be on a bus from Houston, Texas, to Cleveland, Ohio, on April 2, 2017.  FORTIS and TORRES presented conflicting stories regarding the ticket when questioned about it.  TORRES advised that FORTIS rode with him from Houston to Nashville.  Although FORTIS indicated that he took a bus, he stated that the bus trip was from Texas to Nashville.  Neither FORTIS nor TORRES mentioned Ohio.  21st Judicial Drug Task Force personnel noted that persons involved in the transport of narcotics will often purchase a bus ticket in order to place

luggage (containing contraband) on the bus. The subject will then depart the bus terminal and another subject waiting at the destination location will in turn retrieve the luggage containing the contraband.

49.    Based on my training and experience, those involved in the distribution of illicit drugs often travel by vehicle in connection with their illegal activities to meet with coconspirators, conduct drug transactions, or to transport drugs or cash drug proceeds. Cellular phones are frequently used while traveling to communicate with coconspirators via voice and text messaging. The phones often contain text messages that relate to the subject's trafficking and smuggling activities.

50.    DTO's will often utilize vehicles of certain makes and models to transport currency and/or narcotics. The reason for this is that certain vehicles have natural void areas located within the vehicle that can be used to secretly store narcotics, contraband, weapons, and/or bulk cash. The voids provide a method to securely store the aforementioned items in order to avoid detection by law enforcement or other DTO's who may seek to steal the contraband. Items stored in the natural void areas of a vehicle are hidden out of plain view, not easily accessible, and are difficult for law enforcement to detect.

51.    FORTIS and TORRES were encountered on two occasions by law enforcement utilizing two separate Nissan Xterra vehicles. During the first encounter, currency was found concealed in a natural void area located in the rear of the vehicle (Texas

tag 1BD1820).  LPR data showed that the vehicle had been in Buffalo, New York, the day prior to the encounter.

52.     During the second encounter, dryer sheets were found taped to the inside vents of a natural void area located in the same area of the vehicle (Texas license plate #HSJ9627) as the previous currency seizure.  It is your affiant's belief that the use of dryer sheets indicates that contraband was, or was going to be, placed in that area of the vehicle as dryer sheets are often used in an attempt to throw off the scent of a police K9 when concealing narcotics and/or money in a vehicle.  As stated earlier, a review of LPR data on the vehicle shows that it has been traveling to Buffalo, New York, approximately one time per month since November 2016.

53.     It is your affiant's belief that FORTIS and TORRES are involved in the movement of narcotics and currency to and from Buffalo, New York.  This belief is based upon FORTIS and TORRES's travel patterns between Houston, Texas, and Buffalo, New York, inconsistencies in their stories with law enforcement in an attempt to conceal the purpose of their travel, as well as utilizing a natural void area in a vehicle to conceal currency ($84,980).  Furthermore, it is believed that the cellular phones discovered during the seizure of $84,980 will contain evidence related to FORTIS and TORRES' trafficking and smuggling activities.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

54.     On the basis of my training and experience, I know that data stored on

cellular telephones remains in the internal memory devices of such telephones until such data is actively altered or deleted.  HSI has made no effort to alter or erase any of the data stored on the Subject Devices.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices.   This information can sometimes be recovered with forensics tools.  Upon issuance of this warrant, a full forensic analysis of the Subject Devices and SIM cards contained therein will be conducted.   The forensic analysis may include targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence, but, due to the fact that criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information, the forensic analysis may also include scanning storage areas unrelated to things described in **Attachment B**, or perusing all stored information briefly to determine whether it falls within the scope of the warrant.

55.     As further described in **Attachment B**, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the Subject Devices were used, the purpose of their use, who used them, and when.   There is probable cause to believe that this forensic electronic evidence might be on the Subject Devices because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the electronic device and the application of knowledge about how an electronic device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

56.   Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of the Subject Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

57.   Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

17

## CONCLUSION

58.     Based upon the foregoing facts and information, I respectfully submit there is probable cause to believe that the items to be searched, described in **Attachment A**, were used to facilitate the criminal activities alleged, and as such, contain evidence, as set forth in particular in **Attachment B**, relating to the commission of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (possession with the intent to distribute and distribution of a controlled substance, and conspiracy to do so) and Title 18, United States Code, Section 1952(a) (interstate and foreign travel or transportation in aid of racketeering enterprises).

**WHEREFORE**, in consideration of the foregoing, it is respectfully requested that this Court issue the requested search warrant authorizing the search of each item, described in **Attachment A,** for the items described in **Attachment B**.

_____
CHARLES S. TOLIAS
Special Agent
Homeland Security Investigations

Sworn to before me

this _31st_ day of August, 2017.

_____
HONORABLE JEREMIAH J. MCCARTHY
United States Magistrate Judge